AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
4/17/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: \_\_\_MMC\_\_\_ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
04/17/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: \_\_\_GR\_\_\_ DEPUTY

United States of America

v.

DELVONNE DASHON JOHNSON,

Defendant(s)

Case No. 2:25-MJ-02284-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of February 4, 2025 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1040 | Fraud in Connection with Major Disaster or Emergency Benefits |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Brent R. Breezley
Complainant's signature

Brent R. Beezley, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: April 17, 2025

*Judge's signature*

City and state: Los Angeles, California

Hon. Karen Stevenson, Chief U.S. Magistrate Judge
Printed name and title

AUSA: S. Arkow x6975

## **AFFIDAVIT**

I, Brent R. Beezley, being duly sworn, declare and state as follows:

### I.     **BACKGROUND OF AFFIANT**

1.     I am a Special Agent with the Department of Homeland Security-Office of Inspector General ("DHS-OIG") assigned to the Los Angeles Resident Office. I graduated from American Public University with a Bachelor of Arts degree in Criminal Justice. From October 2017 through April 2022, I was employed as Customs and Border Protection Officer at the San Ysidro Port of Entry and performed customs and immigration enforcement. From April 2022 through September 2022, I was employed by the United States Marshals Service, in San Diego, California, and performed cell block intake and operations. From September 2022 through June 2024, I was employed as an Investigative Specialist with Naval Criminal Investigative Service, and performed criminal investigations involving crimes against person, deaths/suicides, child abuse, sexual assaults, and fraud. I have been employed with DHS-OIG as a Special Agent since June 2024 and have had formal training at the Federal Law Enforcement Training Center ("FLETC"), relating to the investigation of financial crimes, general crimes, immigration, and customs. I have completed additional training at the United States Customs and Border Protection Officer Basic Academy at FLETC. I have assisted in and/or personally conducted investigations involving government fraud, narcotics, sexual abuse, domestic violence, deaths, and suicides related to government personnel.

## II. PURPOSE OF AFFIDAVIT

2.  This affidavit is made in support of a criminal complaint against, and arrest warrant for, Delvonne Dashon Johnson ("JOHNSON") for a violation of 18 U.S.C. § 1040 (Fraud in Connection with Major Disaster or Emergency Benefits). This affidavit is also made in support of a warrant to search the person of JOHNSON (the "SUBJECT PERSON"), as described more fully in Attachment A.

3.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 287 (False Claims), 1028A (Aggravated Identity Theft), 1040 (Fraud in Connection with Major Disaster or Emergency Benefits), 1341 (Mail Fraud), and 1343 (Wire Fraud) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. SUMMARY OF PROBABLE CAUSE

5.  An investigation conducted by DHS-OIG has revealed that JOHNSON submitted a fraudulent application to the Federal

Emergency Management Agency ("FEMA") for disaster relief benefits associated with wildfires that destroyed a large number of structures (and caused other damages) in the Los Angeles area in January 2025 (the "Application"). The Application claims that JOHNSON resided at 756 Chapala Drive, Pacific Palisades, California 90272 ("756 Chapala Drive"). As discussed below, the investigation to date has not uncovered any evidence that JOHNSON ever owned, rented, or lived at 756 Chapala Drive. Instead, the owner of 756 Chapala Drive, according to property records, stated that she lived at the address at the time of fires and has never met JOHNSON. According to California Department of Motor Vehicle Records, JOHNSON lives at 1001 N. Berendo Street, Apartment 1 in Los Angeles, California 90029 (the "Berendo Street address"). Further, based on the bank account information listed in the Application for receipt of FEMA benefits, FEMA disbursed funds that were electronically deposited into a bank account in which JOHNSON is the sole account holder and associated with the Berendo Street address.

## IV. STATEMENT OF PROBABLE CAUSE

### A. The California Wildfires

6. As was reported in numerous international, national and local media reports, in early January 2025, a series of destructive wildfires (the "California Wildfires") spread throughout the Los Angeles metropolitan area in California. These fires cumulatively burned nearly 60,000 acres of land, killed 29 people, forced more than 200,000 people to evacuate, and destroyed more than 16,000 structures. The largest of

these fires were the Eaton and Palisades wildfires, which are second and third most destructive wildfires in California history.

7. Based on my review of a "4856-DR-CA-Initial Notice" provided by FEMA, I know that on January 8, 2025, President Biden approved a Major Disaster Declaration for California in response to the California Wildfires under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 et seq.

8. From my involvement in this investigation, I know that FEMA is an agency within DHS. FEMA's primary purpose is to coordinate the response to a disaster that has occurred in the United States and that overwhelms the resources of local and state authorities. In response to the California Wildfires, FEMA made available a program to provide financial assistance to affected individuals and families. Affected persons could apply for assistance online, with the FEMA mobile application, applying at a disaster relief center or by calling the FEMA Helpline. Victims of the California Wildfires, including renters who lost their rental residences, could qualify for a one-time payment of $750 noted as a FEMA relief payment, $43,600 for other needs assistance (personal property, transportation, medical, etc.), and housing assistance for up to 18 months at varying rates (1BR $2,081, 2BR $2,625, 3BR $3,335, 4BR $3,698). Homeowners are also potentially eligible for additional relief up to $43,600 for home repair.

**B.     Submission of a Fraudulent Claim for FEMA Benefits related to the California Wildfires**

9.  According to FEMA records:

    a.  The Application was submitted on February 4, 2025, listing "756 Chapala Drive" in Pacific Palisades, California, as the purportedly damaged dwelling, with a loss date of January 17, 2025, that the applicant claimed to own and live in as his primary residence. The Application identified JOHNSON as the applicant with a social security number ending in 2742 and date of birth in January 1994, using the primary cellular telephone (818) 336-0892 (the "0892 Number"). As noted below, the social security number and date of birth used in the Application correspond to JOHNSON's actual personal identifying information based on law enforcement databases.

    b.  On February 21, 2025 and February 24, 2025, after approving the Application, FEMA sent the following payments via electronic funds transfer: (a) $770.00 initial payment; (b) $15,946.44 for personal property; and (c) $3,822.00 for displacement assistance; and $43,600 for replacement housing for a total of $64,138.44, to a Capital One N.A. Bank ("Capital One") checking account number ending in 9899 (the "Capital One 9899 Account"), which was the account listed in the Application for receipt of any funds disbursed.

10. According to a map of areas damaged by the Palisades Fire, the 756 Chapala Drive address was destroyed as a result of the Palisades Fire.

11. I obtained bank account information from Capital One for the Capital One 9899 Account showing it was opened on January 20, 2025, approximately two weeks before the Application was submitted to FEMA. The Capital One 9899 Account is registered to JOHNSON as the sole account holder and lists (702)-849-3847 (the "3847 Number") as JOHNSON's phone number and the Berendo Street address as JOHNSON's address. According to law enforcement databases, the 3847 Number is associated with JOHNSON. On February 20, 2025, prior to the above-mentioned electronic funds transfer of FEMA funds, the account balance of the Capital One 9899 Account was $5.00. After the deposit of FEMA funds, multiple payment transactions using Zelle as the payment service were sent from JOHNSON's Capital One 9899 account.

    **C.**    **Telephonic Interview with M.M.T.**

12. I obtained a true and certified copy of the grant deed from the Los Angeles County Registrar – Recorder/County Clerk for 756 Chapala Drive. According to those records, the property located at the 756 Chapala Drive address is owned by M.M.T.

13. On April 2, 2025, I conducted a phone interview with M.M.T. She stated she has lived at that property since 2015, it has been her primary residence, and she resided there at the time of the Palisades fire. M.M.T. stated she has never rented her property out to anyone and does not know JOHNSON. M.M.T. stated she submitted a disaster assistance application to FEMA to advise that her house had been destroyed. M.M.T. was notified by FEMA that someone had already filed on behalf of her property

at 756 Chapala Drive. M.M.T. stated she provided FEMA a copy of her property tax records to show she is in fact the owner of 756 Chapala Drive. M.M.T. also said she provided FEMA with a Los Angeles Department of Water and Power bill to show proof of residency at 756 Chapala Drive.

### D. Attempts to Contact JOHNSON and Contact with JOHNSON

14. On April 3, 2025, I attempted to contact JOHNSON by calling the 0892 Number listed on the Application; however, the call went straight to voicemail, and the voicemail recording did not have a greeting or other information that identified the user to whom the 0892 Number belonged.

15. On April 8, 2025, I called the 3847 Number (the phone number listed on JOHNSON's Capital One 9899 Account into which FEMA deposited the funds). When the call was answered, I identified myself as working with the Los Angeles Times and asked if I was speaking with Delvonne Johnson. The male speaker indicated that he was JOHNSON. When I asked if the speaker could verify his address, the speaker hung up the phone.

16. On April 9, 2025, I called the 3847 Number again. The call went straight to voicemail.

17. On April 14, 2025, DHS-OIG Special Agent Nathanael Romero called the 3847 Number. I listened to a recording of the call and learned the following:

   a. Special Agent Romero dialed the 3847 Number, and a male individual answered the call. Special Agent Romero stated he was calling for a Mr. Delvonne Johnson. The male individual asked who was calling, and SA Romero identified himself as a

FEMA contractor with a quality assurance team verifying FEMA disaster assistance applications. Special Agent Romero asked the male individual how he was doing and the male individual indicated he was good. Special Agent Romero stated that he was going through the FEMA disaster applications, and he had a few questions for him, and the male individual agreed to answer.

   b. Special Agent Romero confirmed with the male individual that 756 Chapala Drive was listed as the address that FEMA had on file as the address that was damaged in the fires.

   c. Special Agent Romero confirmed with the male individual that the email address FEMA had on file "for you" was Delvonne3@ICLOUD.com and the male individual indicated that was correct.

   d. Special Agent Romero advised the male individual that he (Special Agent Romero) tried to contact him at the phone number listed on the FEMA application (818) 336-0892 but was unable to get a hold of him. Special Agent Romero asked if the 3847 Number was a good and current phone number, and the male individual replied it was.

   e. Special Agent Romero stated that he (Special Agent Romero) saw that "you received" three deposits for FEMA assistance into a Capital One bank account and wanted to confirm that "you did receive the funds and you got the assistance that you required." At this point, the call was disconnected, and it appeared the male individual hung up the phone. Special Agent Romero dialed the 3847 Number again and after a few rings the call went into voicemail. The voicemail greeting was not a

personalized and stated that the call was forwarded to voicemail to leave a message.

### E. Probable Cause That JOHNSON Submitted the Application

18. As discussed above, information obtained during the investigation indicates the Application included materially false statements. The evidence also provides probable cause to believe it was JOHNSON who submitted the Application. This evidence includes the following:

    a. According to law enforcement databases, the social security number and date of birth listed on the Application match those for JOHNSON, and JOHNSON's date of birth and personal description based on California Department of Motor Vehicles ("DMV") records is as detailed in Attachment A.

    b. The Application directed that any FEMA funds were to be paid into an account on which JOHNSON is the sole account holder for the Capital One account ending in 9899.

    c. Although JOHNSON claimed in the Application to own 756 Chapala Drive, the actual property owner of the 756 Chapala Drive address is M.M.T. M.M.T. confirmed that 756 Chapala Drive has been her primary residence since 2015, and she was residing at the property at the time of the Palisades Fire.

    d. According to California DMV records for JOHNSON, the Berendo Street address is listed as JOHNSON's home address since January 2, 2025. According to law enforcement databases, JOHNSON has been associated with the above-referenced Berendo Street address since at least August 2024.

   e. According to U.S. Postal Inspection Service records, mail has been sent addressed to the recipient's name of Delvonne Johnson to the Berendo Street address since June 2024 and through April 3, 2025.

   f. The phone number listed on the Application (the 0892 Number) is, according to law enforcement databases, associated with JOHNSON at the Berendo Street address.

   g. Records for JOHNSON's Capital One 9899 Account, the account into which FEMA funds were electronically deposited, lists the 3847 Number with that account. As discussed above, when I called the 3847 Number on April 8, 2025, a male speaker answered the phone and indicated he was Delvonne Johnson.

   h. Additionally, based on my review of a carrier registration available on the United States Department of Transportation, Federal Motor Carrier Safety Administration website (ai.fmsca.dot.gov/SMS/Carrier/4073832/CarrierRegistration.aspx, last visited April 15, 2025), I observed that the 3847 Number was associated with a carrier registration for DD Johnson Trucking LLC, which used the email delvonnej@yahoo.com. Based on my review of records available on the California Secretary of State website (bizfileonline.sos.ca.gov/search/business), I observed that DD Johnson Trucking LLC submitted a Statement of Information on May 11, 2023, listing Delvonne Dashon Johnson (JOHNSON) as the "manager or member."

   i. Also, based on insurance claim records in law enforcement databases, I know the following:

          i.    JOHNSON was involved in a car accident on October 21, 2024.  JOHNSON's information in connection with that claim includes the Berendo Street address and the 3847 Number.

          ii.    JOHNSON was involved in a car accident on July 31, 2023.  JOHNSON's information in connection with that claim includes the 3847 Number.

**F.    JOHNSON's Use of a Digital Device and Probable Cause that Evidence, Fruits, and Instrumentalities of the Subject Offenses Will be Found on JOHNSON and Digital Devices in His Control**

19.    The Application listed the 0892 Number as a contact number for JOHNSON.

20.    On February 15, 2025, a person who identified himself as JOHNSON called FEMA to update to request a status update on his application.

21.    On February 18, 2025, a person who identified himself as JOHNSON called FEMA to update to request a status update on his application.

22.    As noted above, I was not able to successfully contact and speak to JOHNSON on the phone using the 0892 Number.

23.    Based on my training and experience, I understand that individuals involved in illegal activities, such as the Subject Offenses, may use digital devices, including cellular telephones, to further their illegal schemes.

24.    I understand from my training experience that individuals committing financial crimes often use and maintain personal digital devices to store information about their crimes during and long after the crimes have been committed.  This

information includes logs of transactions or browsing history; call logs; copies of documents submitted electronically; copies of applications for government benefits; records of funds received; information regarding individuals and companies that have been victimized; records of payments to or from co-conspirators; and victim profiles.

25. I understand individuals who commit financial crimes often access financial account information using their personal digital devices, including through applications offered by financial institutions, and these devices will store records concerning their finances and financial transactions, sometimes for substantial periods long after they are last accessed.

26. I understand individuals who commit financial crimes will often liquidate criminal proceeds to cash or cash equivalents (such as jewelry or precious metals), as well as using criminal proceeds to purchase or finance automobiles, real estate, and other types of property and assets, in order to launder the proceeds, to make the proceeds more difficult to trace, and to profit from the criminal activity. Information concerning a subject's finances, including expenditures and purchases, and other financial information concerning income and work activity, is also evidence of criminal activity to the extent that persons involved in criminal activity do not have legitimate sources of income to support expenditures and purchases.

## V. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

27. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  28. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

29.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials: Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris

recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    a.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    b.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress JOHNSON's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of JOHNSON's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

30. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. REQUEST FOR SEALING

31. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of these applications, including the application and the complaint and search warrant affidavit. I believe that sealing is necessary because the items and

information to be seized is relevant to an ongoing investigation into criminal conduct involving JOHNSON, who is unaware that he is being investigated. In addition, some of his suspected criminal activity may have been facilitated by other co-conspirators.  Disclosure of the complaint and search warrant affidavit at this time would seriously jeopardize the investigation, as such disclosure may provide an opportunity to destroy evidence, change patterns of behavior, or allow flight from prosecution. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on this continuing investigation and may severely jeopardize its effectiveness.

## VII. CONCLUSION

32. For all the reasons described above, there is probable cause to believe that JOHNSON has committed a violation of 18 U.S.C. § 1040 (Fraud in connection with a Natural Disaster and Emergency benefits).

//

//

33. Further, for all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found on JOHNSON, as described in Attachment A.

BRENT R. BEEZLEY
Special Agent
Department of Homeland Security
Office of Inspector General

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 17th day of April, 2025.

HONORABLE KAREN STEVENSON
UNITED STATES MAGISTRATE JUDGE